# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHS, Inc.,

                    Plaintiff,          Civ. No. 10-94 (RHK/FLN)
                                          **MEMORANDUM OPINION**
                                          **AND ORDER**

v.

PetroNet, LLC, and Chelsea
Consulting, Inc.,

                    Defendants.

---

Karen D. McDaniel, Thomas J. Leach, Ryan J. Fletcher, Merchant & Gould, P.C.,
Minneapolis, Minnesota, for Plaintiff.

Jeffrey C. Brown, Jeffrey C. Brown PLLC, Minneapolis, Minnesota, Kenneth L. Kunkle,
Kunkle Law, PLC, St. Paul, Minnesota, for Defendants.

---

## INTRODUCTION

In this action, Plaintiff CHS, Inc. ("CHS") alleges that Defendants PetroNet, LLC

("PetroNet") and Chelsea Consulting, Inc. ("Chelsea") have infringed its copyrights and

misappropriated its trade secrets.  CHS now moves for a preliminary injunction enjoining

such conduct.  For the reasons set forth below, the Court will deny the Motion.[1]

## BACKGROUND

CHS is a fuel supplier that sells bulk fuel to its customers, such as gas stations,

farmers, construction companies, and other high-volume fuel users.  The customers

---

[1] The following constitutes the Court's findings of fact and conclusions of law, as required by
Federal Rules of Civil Procedure 52(a) and 65.

obtain fuel from CHS by having haulers (truckers) "lift" fuel from a CHS fuel terminal. CHS uses information concerning the fuel lift to invoice and bill the customer for the fuel it obtained.

In the past, truck drivers were required to manually enter certain information at the terminal so that CHS was aware which customer had obtained the fuel, what price to charge pursuant to the customer's contract, and the like. This process was both slow and subject to human error, causing billing problems and other accounting errors, and often resulting in customers being billed twice for the same purchase. As a result, in 1999 CHS began to design a computer system that would automate the accounting and billing process for fuel lifts by its customers.

CHS spent the next five years developing the system. In addition to tasking a significant number of its own employees to work on the project, it retained the services of more than a dozen information-technology (IT) consultants, who it paid more than $12 million to work on the project. Ultimately, it developed the "CHS Solution," which comprises two types of customized computer software: (1) "ERP," which was designed to modify CHS's generic accounting software for use in the fuel industry, and (2) "Control Room," which was designed to provide the interface through which customers could manage their purchases from CHS, and which would integrate with the ERP code for automated invoicing, billing, etc. CHS registered the Control Room software with the United States Copyright Office on December 22, 2009, and the ERP software with the Copyright Office on August 16, 2010.

The CHS Solution has been successful. Initial customer feedback was extremely positive, and most of CHS's customers quickly adopted the CHS Solution. Billing errors dropped by nearly 10,000 per year when it was fully rolled-out to customers. Since the time it was implemented, CHS's sales volume has more than doubled.

Defendant Chelsea was one of the consulting companies retained to work on the CHS Solution project. Two Chelsea employees, Caroline Santora and Tareq Mahmood, spent more than 10 years (between the two of them) working on the project, for which Chelsea was paid more than three million dollars. Santora (Chelsea's President) and Mahmood worked full-time on the project out of CHS's offices in Inver Grove Heights, Minnesota, and were exposed to significant portions of its design aspects and implementation during their tenure. They were still working on the project when it was rolled-out to customers and for some time thereafter, during the period initial feedback was provided regarding the CHS Solution.

Chelsea signed a consulting agreement when it undertook work on the CHS Solution project. That agreement required it to maintain as confidential all CHS information provided to it while working on the project, and for a period of five years following the project's completion. Chelsea further agreed that all work product produced for CHS during the project would belong to CHS. Finally, the agreement also required Chelsea to return all CHS property at the agreement's termination.

Santora and Mahmood formed Defendant PetroNet in 2005 or 2006, around the time (or shortly after) their work at CHS ended. PetroNet offers a software product providing substantially similar features as the CHS Solution, which it markets and sells to

CHS's competitors. Mahmood spent between four and seven months "working on the side" to develop the PetroNet product while still working on the CHS Solution project. PetroNet began offering its product for sale in late 2006, and by 2008 it claimed that its product was two years ahead of the competition. By its own projections, it will earn $32 million in revenue in the year 2011.

On January 11, 2010, CHS commenced the instant action against Chelsea and PetroNet, alleging that they had infringed CHS's copyright in the Control Room software, misused its confidential and proprietary information, and misappropriated its trade secrets in violation of the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01 *et seq*. It further alleged that it was "being and will be irreparably harmed by" Defendants' actions, and it included a prayer for "[p]reliminary and permanent injunctive relief" enjoining Defendants from selling the competitive PetroNet program. It did not, however, move for a preliminary injunction at that time.

The parties then undertook discovery, during which PetroNet produced a significant number (nearly 100,000 pages) of CHS documents in its possession. CHS claims that several of those documents contain its "confidential, trade secret, and copyrighted information," including documents that purportedly "outline[] many of the key business processes that enable the [CHS Solution's] functionality." PetroNet also produced several flowcharts, on its own stationery, that are identical to flowcharts Mahmood prepared in 2003 while working on the CHS Solution project, *including the same typographical errors*. On August 16, 2010, shortly after PetroNet produced those flowcharts, CHS obtained copyright registration on them, as well as its ERP code. And

on September 3, 2010, it filed an Amended Complaint asserting additional claims of copyright infringement in the ERP code and the flowcharts.

On September 23, 2010, CHS filed the instant Motion for a Preliminary Injunction. The Motion has been fully briefed and is now ripe for disposition.[2]

## STANDARD OF DECISION

As the Supreme Court recently emphasized, a preliminary injunction "is an extraordinary remedy never awarded as a matter of right." Winter v. Natural Res. Def. Council, Inc., __ U.S. __, 129 S. Ct. 365, 376 (2008). This Court must consider four factors to determine whether preliminary injunctive relief is warranted: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. E.g., Watkins, Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003) (quoting Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). When analyzing these factors, the Court must "flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999).

## ANALYSIS

Having carefully considered the parties' Motion papers, the Court determines that preliminary injunctive relief is not warranted here.

---

[2] The Court canceled the hearing on the Motion after concluding, in view of the parties' voluminous submissions, that oral argument would not materially assist in deciding the Motion. (See Doc. No. 116.)

## I.     Irreparable harm

"The basis of injunctive relief in the federal courts has always been irreparable harm and the inadequacy of legal remedies." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (*per curiam*) (quoting Beacon Theaters, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)). "Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." Id.; accord, e.g., Winter, 129 S. Ct. at 375-76. The failure to show irreparable harm is "an independently sufficient ground upon which to deny" injunctive relief. Watkins, 346 F.3d at 844. Indeed, "in some cases, lack of irreparable injury is the factor that should begin and end the . . . analysis." Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 n.5 (8th Cir. 2008) (*en banc*).[3] For several reasons, the Court determines that CHS has failed to show it is likely to suffer irreparable harm absent an injunction here.

### A.     Delay

First and foremost is CHS's delay in seeking injunctive relief. CHS was aware by at least January 11, 2010, the day it filed its Complaint, that PetroNet was marketing a competing product purportedly infringing its copyright. At that time, it alleged that it

---

[3] As the Supreme Court emphasized just a few months after Planned Parenthood, lack of irreparable harm *must* end the analysis. Winter, 129 S. Ct. at 375-76. Prior to Winter, some courts, including the Eighth Circuit, had held that a "possibility" of irreparable harm might be sufficient to support a preliminary injunction. See Kan. City S. Transp. Co. v. Teamsters Local Union No. 41, 126 F.3d 1059, 1066 (8th Cir. 1997) (affirming preliminary injunction based upon "the possibility of irreparable harm if injunctive relief is not granted"); see also Grocery Outlet Inc. v. Albertson's Inc., 497 F.3d 949, 951 (9th Cir. 2007) (*per curiam*). In Winter, the Supreme Court held that such a "'possibility' standard is too lenient." 129 S. Ct. at 375. Instead, a party seeking preliminary injunctive relief must show that "irreparable injury is *likely* in the absence of an injunction." Id. (emphasis in original).

was "being and will be irreparably harmed by" Defendants' conduct, and it included a prayer for "[p]reliminary and permanent injunctive relief" enjoining the marketing and sale of the PetroNet program. Yet, it did not move for injunctive relief when it filed the Complaint, instead waiting more than *eight months*, all while supposedly being "irreparably harmed," to ask the Court for an injunction. It has offered no explanation for this delay, which the Court believes undermines the notion that it is being (or likely will be) irreparably harmed.

It has long been recognized that delay in seeking relief "vitiates much of the force of . . . allegations of irreparable harm." Beame v. Friends of the Earth, 434 U.S. 1310, 1313 (1977) (Marshall, J., denying application for stay pending review of petition for writ of *certiorari*); Hubbard Feeds, 182 F.3d at 603 (holding that plaintiff's delay in seeking preliminary injunction "belies any claim of irreparable injury pending trial," and recognizing that delay in seeking injunction, standing alone, may justify denying request). "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc., Civ. No. 09-1091, 2010 WL 2131007, at *1 (D. Minn. May 25, 2010) (Ericksen, J.) (internal quotation marks and citations omitted). That is particularly true here. Nothing in the record suggests that CHS was unable to move for injunctive relief sooner, particularly since it purported to seek such relief in its initial Complaint. Contra Safety-Kleen Sys., Inc. v. Hennkens, 301 F.3d 931, 936 (8th Cir. 2002) (seven-month delay did not undermine claimed irreparable harm where delay was caused by plaintiff's discovery efforts and

attempts to "marshal its case for a preliminary injunction").  Under these circumstances, CHS's lengthy delay in seeking an injunction undermines any suggestion that it will be irreparably harmed without Court intervention.[4]

CHS relies upon West Publishing Co. v. Mead Data Central, Inc., 799 F.2d 1219, 1229 (8th Cir. 1986), for the proposition that irreparable harm is *presumed* when a plaintiff shows it is likely to succeed on a copyright-infringement claim.  (See Pl. Mem. at 28.)  Several other Courts of Appeals have reached the same conclusion.  See, e.g., Forry, Inc. v. Neundorfer, Inc., 837 F.2d 259, 267 (6th Cir. 1988); Educ. Testing Servs. v. Katzman, 793 F.2d 533, 544 (3d Cir. 1986); Apple Computer, Inc. v. Formula Int'l, Inc., 725 F.2d 521, 525-26 (9th Cir. 1984).  Yet, it is unclear whether these cases remain good law in light of the Supreme Court's recent decisions in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006), and Winter.[5]  Regardless, assuming *arguendo* that such a

---

[4] That CHS amended its Complaint in September 2010 does not alter the Court's analysis, because by its own reckoning the amendment did "not alter the . . . issues upon which this action is based."  (Doc. No. 49 at 6.)

[5] While discussing permanent injunctions, eBay rejected the notion that "an injunction automatically follows a determination that a copyright has been infringed."  547 U.S. at 392-93. Two years later, the Court highlighted that plaintiffs seeking preliminary injunctions must show that irreparable harm is likely; the mere possibility of such harm will not do.  Winter, 129 S. Ct. at 375.  Reading eBay and Winter together, some courts have held that it is no longer proper to presume irreparable harm when a plaintiff seeking a preliminary injunction has shown it is likely to succeed on a claim of copyright infringement.  See, e.g., Salinger v. Colting, 607 F.3d 68, 76-82 (2d Cir. 2010); Qassas v. Daylight Donut Flour Co., No. 09-CV-0663, 2010 WL 2365472, at *7 (N.D. Okla. June 10, 2010); see also Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007).  Indeed, other judges in this district have come to that conclusion in patent-infringement cases, in which, like copyright cases, irreparable harm also had been presumed upon a showing of infringement.  See, e.g., Travel Tags, Inc. v. UV Color, Inc., 690 F. Supp. 2d 785, 797-98 (D. Minn. 2010) (Tunheim, J.) (collecting cases from this Court holding that in light of eBay and Winter, "district courts conducting preliminary injunction analysis in

presumption arises when a plaintiff shows it is likely to succeed on a claim of copyright infringement, that presumption is rebuttable. E.g., Richard Feiner & Co. v. Turner Entm't Co., 98 F.3d 33, 34 (2d Cir. 1996); Forry, 837 F.2d at 267. And it is well-settled that sufficient delay may rebut the presumption. See, e.g., Bourne Co. v. Tower Records, Inc., 976 F.2d 99, 101 (2d Cir. 1992); Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985); see also Structural Tenting Corp. v. Termite Doctor, No. 09-21285, 2010 WL 2650910, at *2 (S.D. Fla. June 30, 2010) (patent case; finding that "Plaintiffs' eight month delay between filing the Complaint and moving for a preliminary injunction rebuts the presumption that they would be irreparably harmed by the Defendant's activities"); H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC, Civ. A. No. 3:09-00390, 2009 WL 1766095, at *4 (N.D. Tex. June 23, 2009) (trademark case; five-month delay in moving for preliminary injunction "is sufficient to rebut a presumption of irreparable harm"). CHS's lengthy delay seeking injunctive relief is sufficient, in the Court's view, to rebut any presumption that it is likely to suffer imminent irreparable harm from Defendants' conduct.

### B.   Other factors

Besides relying on a presumption, CHS also argues that misappropriation of its trade secrets and unlawful copying of its software may result in irreparable harm in the form of lost market share and damage to its reputation and goodwill. (Pl. Mem. at 29-30.) But mere fear of these types of injuries will not suffice – CHS "must make a

---

patent infringement cases no longer apply a . . . presumption of irreparable harm if a movant makes a clear showing of a likelihood of success on the merits").

showing of actual, substantial harm from the alleged infringement." Travelers Express Co. v. Transaction Tracking Techs., Inc., 305 F. Supp. 2d 1090, 1095 (D. Minn. 2003) (Doty, J.); accord In re Travel Agency Comm'n Antitrust Litig., 898 F. Supp. 685, 689 (D. Minn. 1995) (Rosenbaum, J.) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong."). CHS has failed to make such a showing here. Indeed, despite the fact that PetroNet has been selling its competitive product for the past several years, CHS's sales have been *growing*, not shrinking. See Travelers Express, 305 F. Supp. 2d at 1095 (denying request for preliminary injunction based on lost market share where plaintiff "enjoyed a period of rapid growth" even after defendant began selling allegedly competitive product). Moreover, the Court does not perceive any possibility of lost goodwill if PetroNet continues selling its competing product. There is no likelihood that customers will confuse PetroNet's product for the CHS Solution. Contra Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003).

The Court believes that Defendants' alleged misconduct, if proven true, will have only one impact on CHS: lost customers and, hence, lost sales. Yet, CHS has not shown – or even attempted to show – why such lost sales would not be fully compensable with money damages. And generally speaking, a plaintiff cannot show that it will suffer irreparable harm in such circumstances. See, e.g., Gelco Corp. v. Coniston Partners, 811

F.2d 414, 420 (8th Cir. 1987).[6]  As stated in <u>NewLeaf Designs, LLC v. BestBins Corp.</u>, 168 F. Supp. 2d 1039 (D. Minn. 2001) (Tunheim, J.), Defendants are "attempting to market and sell only one product, a product that admittedly will compete with [CHS's] product.  However, the Court sees no reason why, if [CHS] ultimately prevails, an award of money damages, which includes an amount for lost profits[,] would not adequately compensate [CHS]." <u>Id.</u> at 1045; <u>accord, e.g.</u>, <u>Travelers Express</u>, 305 F. Supp. 2d at 1095 ("Should [defendant's] product eventually be found to infringe, calculation of monetary damages from lost contracts and price erosion would be possible."); <u>Varsity Spirit Fashions & Supplies, Inc. v. Alexander</u>, 226 U.S.P.Q. 524, 526 (D. Minn. 1985) (Murphy, J.) (defendants' alleged theft of plaintiff's designs for cheerleading uniforms insufficient to warrant preliminary injunction, since plaintiff had not demonstrated "that money damages would fail to compensate it for any wrongful use of its . . . designs or other materials").

Furthermore, CHS has not acted in a fashion consistent with a party suffering imminent irreparable injury.  Generally speaking, a plaintiff alleging that a defendant's software infringes the plaintiff's copyright must compare the two programs' codes to demonstrate their substantial similarity.  <u>E.g.</u>, <u>Auto Inspection Servs., Inc. v. Flint Auto Auction, Inc.</u>, 84 U.S.P.Q.2d 1721, 1726-27 (E.D. Mich. 2006) (noting that a member of the software's "intended audience" must compare the copyrighted material and the

---

[6] Irreparable harm may be found in the rare instance where monetary losses "threaten[] the very existence of the [plaintiff's] business."  <u>Packard Elevator v. ICC</u>, 782 F.2d 112, 115 (8th Cir. 1986) (citations omitted).  CHS has nowhere attempted to make such a showing here.

allegedly infringing material, because "[i]n the context of computer programming, legal copying requires a rigorous analysis"). It is not enough to simply point out that two pieces of software perform the same functions or do the same thing – the plaintiff must instead show that the infringing software performs the copyrighted software's functions *in the same original way*. E.g., id.; Maddog Software, Inc. v. Sklader, 382 F. Supp. 2d 268, 279 (D.N.H. 2005).[7] Yet, CHS eschewed comparing the products' code here, arguing that doing so involved "technical issues" rendering the comparison too complicated. (Pl. Mem. at 28.) The avoidance of such a comparison is inimical to the notion that CHS will be irreparably harmed absent injunctive relief.[8]

## II.     The remaining factors

As noted above, the Court's analysis could end with CHS's failure to show irreparable harm. Nevertheless, the Court will briefly address the remaining Dataphase factors, which it believes do not support injunctive relief.

### A.     Likelihood of success

In order to obtain a preliminary injunction, CHS must show that it has a "fair chance of prevailing" on its claims. Planned Parenthood, 530 F.3d at 732. The question

---

[7] CHS seems to recognize as much. Once Defendants pointed out that other software in the industry performs many of the same functions as the CHS Solution, CHS's expert attempted to downplay that fact by pointing out that none of the documents submitted by Defendants "explain *how*" the other software "offer[s] that [overlapping] functionality." (Charles Decl. ¶ 20 (emphasis in original).) In other words, CHS recognizes the importance of demonstrating *how* the PetroNet product performs the same functions as the CHS Solution.

[8] After Defendants noted in their Opposition Memorandum that CHS had failed to compare the code, CHS submitted such a comparison with its Reply Memorandum. (See Charles Decl. ¶¶ 9-19.) But matters raised for the first time in a reply brief will not be considered by the Court. See, e.g., Buetow v. A.L.S. Enters., Inc., 259 F.R.D. 187, 194 n.2 (D. Minn. 2009) (Kyle, J.); D. Minn. LR 7.1(b)(3).

is not whether it has "prove[d] a greater than fifty percent likelihood that [it] will prevail," PCTV Gold, Inc. v. SpeedNet, LLC, 508 F.3d 1137, 1143 (8th Cir. 2007), but rather whether any of its claims provide a "fair ground for litigation," Watkins, 346 F.3d at 844.

At first blush, it would appear that CHS is likely to succeed on the merits, because Defendants' conduct is clearly troubling. Santora and Mahmood undoubtedly were exposed to sensitive and confidential information during their work on the CHS Solution project. A short time after leaving, they created a new company with a competitive product containing many of the same features as the CHS Solution, which it has begun selling (or attempting to sell) to CHS's customers. Simply put: this looks bad. And it might ultimately entitle CHS to some relief on the merits. Yet, a closer analysis of CHS's claims suggests that things are not as clear as they might seem.

Regarding its trade-secret claims, CHS argues that "source code, feature sets, and business practices" incorporated into the CHS Solution are protectable. (Pl. Mem. at 18.) But these so-called trade secrets are amorphous and ill-defined.[9] A party asserting trade-secret misappropriation must "define its alleged trade secrets with sufficient specificity," Hutchinson Tech. Corp. v. Magnecomp Corp., Civ. No. 06-1703, 2006 WL 2061707, at *5 (D. Minn. July 17, 2006) (Ericksen, J.); accord, e.g., NewLeaf, 168 F. Supp. 2d at 1046, which is lacking here. Moreover, many of the "feature sets" and "business

---

[9] All of this brings to mind an exasperated Alice who, after having read Jabberwocky with the aid of a mirror, exclaimed: "It seems very pretty . . . but it's rather hard to understand! . . . . Somehow it seems to fill my head with ideas – only I don't exactly know what they are!" United States v. Gotti, 755 F. Supp. 1159, 1164 (E.D.N.Y. 1991) (quoting Lewis Carroll, Through the Looking Glass, ch. 1).

practices" in which CHS claims trade-secret protection appear to be functions found in other software on the market. (<u>See</u> Kunkle Decl. Exs. 1-8.) That competitors offer software with many of the same features indicates that much (if not all) of what CHS claims may not be protectable. <u>See, e.g.</u>, Minn. Stat. § 325C.01, subd. 5(i) (defining a trade secret as something "not . . . generally known to, and not . . . readily ascertainable by proper means by, other persons"); <u>Watkins, Inc. v. Lewis</u>, Civ. No. 02-3708, 2002 WL 31319491, at *13 (D. Minn. Oct. 11, 2002) (Kyle, J.) ("An injunction is inappropriate if plaintiff fails to identify specific trade secrets and instead produces long lists of general areas of information which contain unidentified trade secrets.") (citation omitted); <u>Int'l Bus. Mach. Corp. v. Seagate Tech., Inc.</u>, 941 F. Supp. 98, 101 (D. Minn. 1992) (Magnuson, J.) ("General knowledge within an industry does not constitute trade secrets."). And while CHS also argues that Defendants have stolen its source code, there is little evidence to support that contention, other than the fact that PetroNet's product performs some of the same functions as the CHS Solution. As noted above, the mere fact that two pieces of software perform the same functions is insufficient, absent a more exacting analysis of the software that is missing here.

Similarly problematic are the copyright-infringement claims. The lack of a sufficient comparison between the accused software and the copyrighted software makes an infringement analysis difficult, at best. <u>See</u> <u>Integrated Bar Coating Sys., Co. v. Wemert</u>, Civ. No. 04-60271, 2007 WL 496464, at *4 (E.D. Mich. Feb. 12, 2007) ("In general, the lay public does not possess knowledge of what constitutes creativity in the computer code writing industry, which elements are standard, and which elements are

dictated by efficiency or by external standards. Substantial similarity should be considered from the viewpoint of the intended audience, which in this case, are those with knowledge and expertise in computer programming.") (internal quotation marks and citation omitted). CHS contends that it has direct evidence Mahmood copied the CHS Solution, in the form of two persons working on the project who claim they observed him copying the software around the time his work at CHS ended. But Mahmood denies any such copying (save for a small portion of the CHS Solution code that he allegedly made for backup, ostensibly with the authorization of his supervisor). And CHS has proffered no probative evidence that Mahmood actually possesses direct copies of its source code, or that he has incorporated that "copied" code into the PetroNet product.[10]

At bottom, there are serious questions as this stage whether CHS is likely to prevail.

### B. Balance of hardships

As discussed above, CHS has made little showing that it will be irreparably harmed absent injunctive relief. On the other hand, an injunction would essentially put PetroNet out of business, insofar as its competing software is the only product it sells. Under these circumstances, "the harm suffered by [CHS] . . . – effectively preventing [Defendants] from competing with [it] in the . . . market – outweighs any harm that [CHS] may suffer without an injunction." Internet Inc. v. Tensar Polytechnologies, Inc., 77 U.S.P.Q.2d 1122, 1129 (D. Minn. 2005) (Kyle, J.); accord, e.g., NewLeaf, 168 F.

---

[10] CHS also claims copyright protection in its flowcharts, and there is little dispute that PetroNet has in fact copied them, right down to the typos. But as with its computer code, CHS has not proffered evidence that the flowcharts have been used or incorporated into PetroNet's product.

Supp. 2d at 1046. This is especially true given that, despite the lengthy tenure of Santora's and Mahmood's work on the CHS Solution project, CHS never asked them (or Chelsea) to sign a non-competition agreement. "A claim of trade secret misappropriation should not act as an *ex post facto* covenant not to compete." Int'l Bus. Mach., 941 F. Supp. at 101 (citing E.W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1112-13 (8th Cir. 1969)). Where CHS could have taken steps to prevent the "unlawful" competition about which it now complains but failed to do so, the balance of hardships does not weigh in its favor.

### C.    The public interest

As the undersigned noted in Internet Inc., "[a]bsent clear evidence of wrongdoing on the part of [Defendants], public policy does not support an order enjoining [them] from . . . competing with [CHS] in the . . . market, and in effect allowing [CHS] to operate without competition from at least one potential competitor." 77 U.S.P.Q.2d at 1132; accord, e.g., Benfield, Inc. v. Moline, 351 F. Supp. 2d 911, 919 (D. Minn. 2004) (Davis, J.) (noting that public interest favors competition). The public interest does not militate in favor of injunctive relief here.

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that CHS's Motion for Preliminary Injunction (Doc. No. 63) is **DENIED**.

Date:  November 15, 2010

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge