## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

CHS Inc.,

　　　　　　　　　　　　　Plaintiff,

　　　　　　　　　　　　　　　　　　　Civ. No. 10-94 (RHK/FLN)
　　　　　　　　　　　　　　　　　　　**MEMORANDUM OPINION
　　　　　　　　　　　　　　　　　　　AND ORDER**

v.

PetroNet, LLC, and Chelsea
Consulting, Inc.,

　　　　　　　　　　　　　Defendants.

Karen D. McDaniel, Thomas J. Leach, III, Merchant & Gould PC, Minneapolis,
Minnesota, for Plaintiff.

Jeffrey C. Brown, Jeffrey C. Brown PLLC, Minneapolis, Minnesota, and Kenneth L.
Kunkle, Kunkle Law PLC, Saint Paul, Minnesota, for Defendants.

## INTRODUCTION

　　　　Plaintiff CHS, Inc. ("CHS") developed a software system customized to the needs

of its fuel business.  Defendant Chelsea Consulting, Inc. ("Chelsea") worked on

developing CHS's software.  Subsequently, two individuals from Chelsea formed a new

company—Defendant PetroNet, LLC ("PetroNet")—and began marketing similar

software to competing fuel companies.  CHS then commenced this action, alleging that

Chelsea and PetroNet misappropriated its trade secrets, infringed its copyrights, and

misused other confidential and proprietary information.  Defendants now move for

summary judgment.  For the reasons set forth below, the Court will grant the Motion in

part and deny it in part.

## BACKGROUND

### I.    CHS and its development of CHS's Solution

CHS is a downstream oil and gas company that sells bulk fuel to customers such as gas stations, farmers, construction companies, and other high-volume fuel users. When customers obtain fuel from CHS, they send trucks to "lift" fuel from designated terminals.  CHS later uses the information about these fuel lifts to generate invoices and bill customers for the fuel.

In years past, CHS has used a combination of manual systems and software tools to run various aspects of its business.  For example, when fuel lifts took place, truck drivers manually recorded information at the terminal so CHS could later identify the customer and determine what price to charge based on the quantity, type, and amount of fuel lifted.  This process was slow and subject to human error.  It also failed to provide up-to-date pricing information to CHS and its customers.  Accordingly, in the fall of 2000, CHS began a project to design and implement a software solution that would automate tasks previously done manually and integrate aspects of its business that had been managed using differing software tools.

It licensed a software program called JD Edwards ("JDE").  JDE is an Enterprise Resource Product ("ERP") solution, which is a type of program that can manage virtually all of a business's "back of house" operations, including finance and accounting, sales, operations, inventory management, and product pricing, to name just a few.  (See, e.g., Brown Decl. Ex. 6 (Charles Rebuttal Rep.), ¶ 5.)  When a company licenses the JDE product, it can use the program in its unmodified, "out-of-the-box" form, or it may

2

configure options within the program to make it better fit its specific business needs. Additionally, a company may build onto the JDE platform by writing custom code into the program to perform functions unique to its business.  (See id.)  CHS spent approximately five years and more than $12 million modifying and customizing JDE to specifically accommodate its business needs and goals.  (See Brown Decl. Ex. 10; accord Stark Decl. ¶ 1.)  The completed program is known as CHS's "Solution."

The Solution consists of two parts: (1) custom code written into JDE to allow CHS to more efficiently receive and process data specific to its fuel business, and (2) a system called Control Room, a custom application CHS developed for use by its customers that sends and receives information such as orders, pricing, inventory availability, and the like.  (See Weisbrod Decl. ¶ 1; Charles Rebuttal Rep. ¶ 8.) Additionally, the Solution includes an interface between JDE and Control Room.  Both parts required CHS to write custom computer code.  (See Weisbrod Decl. ¶ 2.)

CHS registered a copyright for the custom code in its ERP system—titled "CHS, Inc. Custom ERP Code 2006"—with the United States Copyright Office.  (Am. Compl. ¶ 37; Fletcher Decl. Ex. W.)  It did the same for its "Petroex Order Creation Process Flow" flowcharts, which depict how data about bills of lading is received and processed, a key component of the software system. [1]  (Am. Compl. ¶¶ 44-45; Fletcher Decl. Ex. V.)

The end product of CHS's efforts was an integrated system that provides up-to-date information about pricing, inventory, and supply to both CHS and its customers,

---

[1] CHS also registered a third copyright for its Control Room software.  This copyright was initially the subject of a copyright-infringement claim in this case, but CHS has agreed to drop that claim.  (See Mem. in Opp'n at 40.)

automates the billing process, and allows customers to manage their accounts online through Control Room.  CHS dos not sell its Solution; however, the program is a feature its customers may use when they contract with CHS, and it is a reason for customers to choose CHS over other companies.  (Brown Decl. Ex. 7, ¶ 9.)  Because many companies sell the same fuel, CHS believes its Solution sets it apart from competitors by offering "a unique service environment."  (Stark Decl. ¶ 5.)  CHS credits its Solution with creating "a competitive advantage by dramatically lowering CHS's costs to manage customer accounts by automating its billing process and providing up-to-date information," and it characterizes the program as "an enormous success."  (Am. Compl. ¶ 18.)

## II.      Chelsea's role in developing CHS's Solution

CHS hired numerous independent contractors to work on the project to develop its Solution, including Defendant Chelsea.  At the root of this case is the conduct of two individuals from Chelsea, Caroline Santora and Tareq Mahmood.  Santora, the President of Chelsea, is a project manager who had prior experience in the fuel industry.  She was placed in charge of overseeing the entire project.  Mahmood is a computer developer who wrote much of the code for the software and is currently Chelsea's Vice President.

CHS hired Chelsea to work on the project.  On behalf of Chelsea, Santora executed a Consulting Agreement with CHS in May 2003.  This Agreement contained a confidentiality provision, providing:

> Consultant agrees that all information supplied to Consultant pursuant to this Agreement shall be "Confidential" and shall be held strictly confidential and shall not be revealed to third parties during or for a period of five (5) years after termination of this Agreement for any reason whatsoever without [CHS]'s prior written approval.  Consultant shall not

4

use confidential information for any other purpose tha[n] carrying out the services contract herein. . . .

Consultant has no obligation to preserve the confidentiality of any information which: (a) was previously known or developed by Consultant free of any obligation to keep it confidential; or (b) is or becomes publicly available other than by an unauthorized disclosure; or (c) is disclosed to third parties by [CHS] without restriction; or (d) is received by Consultant from a third party who is rightfully in possession of such information and has proper authority to disclose it.

(Fletcher Decl. Ex. B ¶ 6.)  Additionally, the Agreement provided that CHS would be the sole owner of any property created by Chelsea related to CHS's project:

All right, title and interest to any programs, systems, data or materials created, prepared or delivered by Consultant pursuant to these terms and conditions (the 'Deliverables'), including, without limitation, any copyrights, patents, trade secret and other intellectual property rights therein are and shall be held by [CHS] and shall be considered 'works made for hire' as that term is defined in The Copyright Act of 1976. . . .

(Id. ¶ 7.)

There is disagreement as to how CHS's Solution was actually developed. According to CHS, the process was a collaborative one.  It created voluminous development documents that mapped out its business operations for the developers so they could build custom software to meet its needs, and CHS claims it provided Chelsea with extensive information, specifications, and functionality requirements for the Solution in order to facilitate designing and building the program.  (E.g., Am. Compl. ¶ 16; Onken Decl. ¶¶ 1-4; Weisbrod Decl. ¶ 5.)  CHS asserts that Chelsea representatives were "exposed to full information about the problems CHS was seeking to resolve and the solutions it tried that failed (such as an initial pricing solution) and the ones that ultimately succeeded (such as the final implemented CHS custom pricing program)."

5

(Charles Rebuttal Rep. ¶ 14.)  For example, a CHS senior business analyst who worked on the project explains the development of the program's "blend and split" feature (for fuel lifts involving multiple types of fuel that must be billed as a single "blended" fuel) as follows:  "CHS spent a year trying to get this feature of the system to work properly. CHS personnel, including myself, explained to Mr. Mahmood the business objective we were seeking to achieve and why, and he wrote the code for this feature of the program." (Onken Decl. ¶ 5.)

On the other hand, Santora describes the development process much differently. She asserts that she did not collaborate with any CHS employees but rather ran the project entirely on her own, relying on her prior general knowledge about the fuel industry.  (Santora Dep. at 116 ("I designed the [CHS] system based on my prior experience, again, of working with other oil and gas companies . . . . Their people were not involved."); see also id. at 114, 120.)  She further claims she was given little, if any, information from CHS.  Defendants also maintain that Chelsea played no role in developing the Control Room program, but worked solely on the ERP program.  (See Answer to Am. Compl. ¶ 15.)

Regardless of precisely how its development progressed, the parties agree that the Solution was completed around early 2005.  (Am. Compl. ¶ 17.)  The relationship between CHS and Chelsea ended after the project's completion.  CHS paid Chelsea just over $3.3 million for its work on the Solution.  (Stark Decl. ¶ 1.)

During the years Chelsea worked on CHS's Solution, Santora and Mahmood spent time on site at CHS's facility and had offices at the company's headquarters.  (Am.

Compl. ¶ 16.)  Santora acknowledges that she regularly e-mailed documents related to the

CHS project to herself, which she saved in a folder on her hard drive and later transferred

onto her new laptop computer.  (Santora Dep. at 203-05, 207-09.)  She considered these

documents to be her "work product," and she retained them after Chelsea's business

relationship with CHS ended.  (Id. at 207-09 (calling the documents "my property"); id.

210-13.)  Additionally, shortly before Mahmood left CHS, another employee observed

him in his office with an external hard drive hooked up to his computer.  (Berkowitz

Decl. ¶ 2.)  That employee recalls Mahmood saying something to the effect of "I'm

copying it.  I wrote it," but he did not know whether Mahmood had permission to copy

files, and he only mentioned the incident to one colleague.  (Id. ¶¶ 3-4.)  Another

consultant similarly remembers seeing Mahmood with a personal hard drive hooked up to

the computer in his office at CHS and hearing Mahmood comment that he was "copying

the system."  (Swiderski Decl. ¶ 3.)

## III.    PetroNet and its software

Around the time their work for CHS ended, Santora and Mahmood partnered to

form PetroNet.  They are the company's only owners.  PetroNet developed a JDE-based

ERP software program customized and modified for use by fuel companies.  Mahmood

allegedly spent time "working on the side" to develop the PetroNet system while still

working on CHS's project.  In May 2007, PetroNet registered a copyright for its

software.  It markets the system to other companies in the fuel industry, some of whom

directly compete with CHS.  PetroNet created no development documents of its own,

which CHS deems atypical for a complex software development project of this nature.

(See Brown Decl. Ex. 5 (Charles Rep.) ¶ 20.)  Defendants claim, however, that lack of

development documents is not unusual when a program is created by computer

developers themselves rather than by a company, such as CHS, which must communicate

to the developers what it wants.  (See id. Ex. 8 (James Rep.) ¶ 28.)

CHS asserts that PetroNet's system is substantially similar to CHS's Solution in

numerous ways.  CHS's expert, who reviewed the two programs, opines that PetroNet's

code exhibits "almost identical program numbering conventions" to CHS's code, and he

identifies similarities in some of the most "mission critical" custom features of the

system.  (Charles Rep. ¶ 34.)  He explains that, although the programs' codes appear

different, the "underlying business requirement and functionality logic, feature sets, and

data structure are nearly identical."  (Id. ¶ 29.)  He attributes the differences to the fact

that the systems were based on different versions of the JDE program.  (Id. at ¶¶ 29, 33.)

Not surprisingly, Defendants take a very different view.  Their expert opines there

is "absolutely no evidence" in either the ERP system or the Control Room software to

indicate that PetroNet copied or used CHS's code.  (James Rep. ¶ 19; accord id. ¶¶ 11-

18.)  He explains that, unlike CHS's Solution, which contains extensive code external to

JDE aimed at working with its Control Room program, PetroNet's system does not have

any custom code outside of JDE.  (Id. ¶ 9.)  Further, Defendants point out that "even

programs with generally similar functional intent show differences in code and

functionality that make it clear that not only is the PetroNet code not a copy of the CHS

code at the detail level, but there are functional elements present in CHS that are not

present in the PetroNet code and vice versa."  (Id. ¶ 35; see also id. ¶¶ 28, 41.)

8

Defendants' expert also believes that differences in the coding between the two programs are not attributable to the fact they are built on different versions of JDE as CHS asserts, because CHS's code could have worked "perfectly" in the newer version of JDE without any modification, indicating that PetroNet's system was independently developed.  (Id. ¶¶ 30-31.)  He also disagrees with the specific similarities in the code identified by CHS's expert.  (E.g., id. ¶ 38.)

In addition to comparisons of the code, CHS points to documents produced by PetroNet in discovery that are similar (or in some cases identical) to CHS documents. For instance, PetroNet's "[Bill of Lading] Cross Reference Entry" flowchart is virtually identical—even containing the same typographical errors—to a CHS flowchart, which was designed specifically for CHS's unique processes and business needs.  (Id. ¶¶ 27-28; Fletcher Decl. Ex. G.)  PetroNet even supplied this flowchart to one of its consultants, Tamara Atchley, to use in explaining its system to a customer.  (Fletcher Decl. Ex. Q (Atchley Dep.) at 155-57; id. Ex. P.)  CHS also identifies documents PetroNet supplied to Atchley that reference CHS's programs, depict CHS's exact computer code in screen shots, and even bear the identifier "division of CHS Cooperatives" on some pages. (Fletcher Decl. Exs. O-Q.)

PetroNet produced some 97,000 pages of CHS documents it had in its possession. Metadata from several of these documents indicate that some the files were modified in 2008 and 2009, after the CHS project had concluded and Chelsea's work for CHS had ended.  (Fletcher Decl. Ex. F (Mahmood Dep.) at 125-27, 130.)  When asked about this, Mahmood had no explanation.  (Id.)  Santora maintains that all the CHS documents

9

retained after Chelsea finished work on CHS's Solution were Chelsea's work product and that none contained any confidential information.  (Santora Dep. at 114-20, 203-09.)  In CHS's view, however, much of the information contained in those documents constitutes trade-secrets.  (Charles Rebuttal Rep. ¶¶ 25, 31.)

CHS commenced this action on January 11, 2010, asserting claims for copyright infringement related to its ERP system (Count II), copyright infringement related to its Petroex Order Creation Process Flowcharts (Count III), misuse of proprietary or confidential information (Count IV), and misappropriation of trade secrets (Count V).[2] Defendants now move for summary judgment.  The parties dispute whether any of CHS's information was trade secret (and, if so, what information), as well as the extent of similarities, if any, between the code for CHS's Solution and the code for PetroNet's system.  For the reasons explained below, the Court will deny Defendants' Motion with respect to the copyright claims and grant it with respect to the remaining claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the

---

[2] As explained above, Count I (claiming infringement of CHS's Control-Room software copyright) has been abandoned.  See supra note 1.  Defendants deny the allegations in each claim and have asserted a number of counterclaims.  In their initial Motion (Doc. No. 148), Defendants sought summary judgment on both CHS's claims and their own counterclaims.  But they subsequently filed an Amended Motion for Summary Judgment (Doc. No. 157), in which they seek summary judgment only on the claims in CHS's Complaint.

material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573

F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that

may be reasonably drawn from it, in the light most favorable to the nonmoving party.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v.

Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible

evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 3, 528 F.3d

1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

### I.      Misappropriation of trade secrets (Count V)

The Minnesota Uniform Trade Secrets Act ("MUTSA") prohibits the improper

acquisition, use, or disclosure of trade-secret information.  Minn. Stat. § 325C.01-08.  A

trade secret is information that (1) is not generally known or readily ascertainable; (2) has

value as a result of its secrecy; and (3) is the subject of reasonable efforts under the

circumstances to protect its secrecy.  Minn. Stat. § 325C.01, subd. 5; accord Wyeth v.

Natural Biologics, Inc., 395 F.3d 897, 899 (8th Cir. 2005).  Additionally, "[i]n a suit for

misappropriation of trade secrets, the plaintiff must specify what information it seeks to

protect."  E.g., Fox Sports Net N., LLC v. Minn. Twins P'ship, 319 F.3d 329, 335 (8th

Cir. 2003) (citation omitted); Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d

890, 898 (Minn. 1983) (finding "lack of clarity" fatal to plaintiffs' claims).

Defendants argue that CHS has failed to identify the information it considers to be trade secret with sufficient specificity.  (See Mem. in Supp. at 17-18, 22-23.)  CHS responds that it *has* specifically identified trade-secret information—including the source code, feature sets, and business rules underlying its Solution.  (See Mem. in Opp'n at 22-28.)  The Court disagrees.

Defendants rely upon AMP, Inc. v. Fleischhacker, 823 F.2d 1199 (7th Cir. 1987),[3] which determined that the plaintiff had failed to "specify precisely what trade secrets it believe[d] to be at risk by identifying particular documents or other sources of information."  Id. at 1203 (citing Litton Sys, Inc. v. Sundstrand Corp., 750 F.2d 952, 954, 956-57 (Fed. Cir. 1984)).  In AMP, generalized claims that the defendant misappropriated "confidential business and technical information" were insufficient, and even the plaintiff's pre-trial submission of "six single-spaced, typewritten pages listing by general item and category hundreds of pieces of AMP internal information" could not rectify this failure.  Id.

In response, CHS attempts to identify four features of its Solution as trade secrets: (1) the "Manifest Management" feature, (2) the blend-and-split feature, (3) the methods of establishing prices and notifying CHS and its customers, and (4) the "Sales Order Create" process.  (See Mem. in Opp'n at 23-24.)  Elsewhere, it claims the following functions within the program are trade secrets: the "Price Variable Table Maintenance and Variable Integrity Report," the "Time-based Contract Adjustment," the "Contract

---

[3] Although AMP predated, and was technically superseded by, the Illinois Trade Secret Act, the Seventh Circuit has noted that the case "continues to reflect the proper standard under Illinois's current statutory scheme."  PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995).

Agreement Information Extract," and the "Sales Order Processing."  (Charles Rep.

¶¶ 34.)  With respect to each identified feature or function, however, CHS simply claims

that the structure, functionality, and underlying business rules are protected trade secrets.

It claims trade-secret protection at multiple levels—ranging from the overarching

business purposes and processes to the detailed computer code through which key

functions are carried out—yet it never clearly identifies those purposes or processes, nor

does it describe in sufficient detail *how* the features and functions actually operate.

Tellingly, when the Court inquired about the trade secrets at the hearing on this Motion,

CHS was unable to enumerate them.  Instead, it replied there were "in the order of

probably six to eight" trade secrets at issue.  It also said there were approximately six key

features which were trade secrets and should be presented to a jury, which is inconsistent

with the number of features identified in CHS's brief and laid out above.

    In the Court's view, CHS's varying attempts to identify features and functions as

trade secrets do no more than list "general areas of information which contain

unidentified trade secrets" as AMP warns against.  823 F.3d at 1203 (citations omitted).

CHS does not give the Court an adequate understanding of what it seeks to protect or

how to protect it.  See Internet Inc. v. Tensar Polytechs., Inc., Civ. No. 05-317, 2005 WL

2453170, at *6 (D. Minn. Oct. 3, 2005) (Kyle, J.) (quoting Porous Media Corp. v.

Midland Brake Inc., 187 F.R.D. 598, 600 (D. Minn. 1999) (Mason, M.J.)) ("Failure to

identify the trade secrets with sufficient specificity renders the Court powerless to enforce

any trade secret claim."); Electro-Craft, 332 N.W.2d at 898 ("[G]iven [plaintiff]'s lack of

specificity, it was impossible for the district court to fashion a meaningful injunction which would not overly restrict legitimate competition.").

In addition to the features and functions, CHS attempts to identify three categories of development documents as trade secrets—those memorializing the "as is" operations and business rules of the company, flowcharts depicting business processes, and "critical" process documents providing a "road map" to the software and where various features are located within the code. (See Charles Rep. ¶¶ 21(b), 24-25.) As with the features and functions discussed above, however, CHS again fails to explain *what* the allegedly secret processes reflected in these documents are, instead giving only general categories and a few specific examples of the documents it claims are trade secrets.

Finally, CHS claims that the way its Solution combines its various features constitutes a trade secret. (See Mem. in Opp'n at 18.) In some instances, a combination of elements or features may constitute a protectable trade secret, so long as the combination is unique or novel. See Electro-Craft, 332 N.W.2d at 899; see also SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC ("SL Montevideo I"), No. Civ. 03-3302, 2005 WL 1923811, at *11 (D. Minn. Aug. 11, 2005) (Kyle, J.) (rejecting defendants' argument that plaintiff had failed to specify the information considered trade secret where it had identified "the entire design" of the motor at issue as well as certain individual components). However, "[s]imply to assert a trade secret resides in some combination of otherwise known data is not sufficient, as the combination itself must be delineated with some particularity in establishing its trade secret status." Jostens, Inc. v. Nat'l Computer Sys., 318 N.W.2d 691, 699 (Minn. 1982); accord SL Montevideo Tech.,

Inc. v. Eaton Aerospace, LLC ("SL Montevideo II"), No. Civ. 03-3302, 2006 WL 1472860, at *3 (D. Minn. May 26, 2006) (Kyle, J) (granting judgment as a matter of law where plaintiff failed to identify with sufficient particularity how the "guts" of the allegedly trade-secret motor were compiled). Identifying "performance characteristics" is not enough where a plaintiff claims the entire design of its product as a trade secret. See SL Montevideo II, 2006 WL 1472860, at *3. Here, because CHS has made no attempt to describe with any particularity how its Solution's features are combined in a unique or novel way, the claim cannot survive summary judgment on this basis either.

CHS was not without warning about the Court's reservations. In its previous Order on CHS's Motion for Preliminary Injunction, the Court opined that the "so-called trade secrets are amorphous and ill-defined" and noted that sufficient specificity in defining the alleged trade secrets appeared to be lacking. (Doc. No. 117, at 13.) Yet CHS largely relies on the same evidence it previously submitted in support of the preliminary-injunction Motion. Its newly-proffered expert report attempts to add detail, yet its expert still only lists broad categories of business documents (see Charles Rep. ¶ 21(b)) and identifies general functions from the Solution's code (see id. ¶ 34). The report concludes that the "logic, routines, sequencing, field names and descriptors," and "program numbering conventions" of functions in CHS's Solution are virtually identical to PetroNet's system (see id. ¶ 34), but it fails to explain with any particularity how the functions operate or what makes them protectable trade secrets in the first place. Since CHS has failed to specifically identify its alleged trade secrets as required under Minnesota law, its trade-secret claim cannot survive the instant Motion.

## II.      Copyright infringement (Counts II-III)

Copyright infringement requires proof of (1) ownership of a valid copyright; and (2) copying of the copyrighted work.  E.g., Thimbleberries, Inc. v. C & F Enters., Inc., 142 F. Supp. 2d 1132, 1137 (D. Minn. 2001) (Doty, J.) (citing Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 941 (8th Cir. 1992)).  To show ownership, a plaintiff must show that the material is original, that it can be copyrighted, and that all statutory formalities have been satisfied.  Thimbleberries, 142 F. Supp. 2d at 1137.  Copying may be shown through direct evidence, but "[b]ecause direct evidence of copying is rarely available, a plaintiff generally must show that the defendant had access to the copyrighted material and that the accused work is substantially similar to the copyrighted work."  Thimbleberries, 142 F. Supp. 2d at 1139 (citing Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157, 1162 (9th Cir. 1977)).  CHS claims infringement of two separate copyrights—the custom code in its ERP system and its Petroex flowcharts.  The Court will address each in turn.

As an initial matter, however, it is not disputed that Chelsea (acting through Santora and Mahmood) had access to both the ERP system code and the Petroex flowcharts.  Access is shown if Defendants had a "reasonable possibility" of seeing the copyrighted information.  Id. (citing Moore, 972 F.2d at 942).  Given both individuals' roles in developing CHS's Solution and the extent of their involvement in the project, they had at least a reasonable possibility of seeing the copyrighted information.  Thus, whether copying occurred will turn on whether there is either substantial similarity between the works or direct evidence of copying.

A.  ERP custom code (Count II)

With respect to the infringement claim based on the ERP system code, Defendants

do not challenge the validity of CHS's copyright.  They argue, however, that CHS has

failed to show substantial similarity,[4] because CHS's expert, Jeffrey Charles, failed to

apply the abstraction-filtration-comparison ("AFC") test.  (See Mem. in Supp. at 36.)

The AFC test, first outlined by the Second Circuit in Computer Associates, International,

Inc. v. Altai, Inc., 982 F.2d 693 (2d Cir. 1992), and later refined by the Tenth Circuit in

Gates Rubber Co. v. Bando Chemical Industries, Ltd., 9 F.3d 823, 841 (10th Cir. 1993),

is a three-part approach to assess whether protectable expression has been copied.  Using

AFC, a court "breaks down the alleged infringed program into its constituent structural

parts; filters out all non-protectable material; and then compares this material with the

structure of an allegedly infringing program."  Mayo Clinic v. Elkin ("Elkin II"), No. 09-

322, 2010 WL 5421322, at *6 (D. Minn. Dec. 27, 2010) (Doty, J.).  The Eighth Circuit

has not adopted the test to date, but many other Circuits have.  Id. (collecting cases).  The

AFC test "provides a *helpful structure* to use in examining a computer program and

determining which, if any, components of the program warrant protection under the

copyright laws."  I-Sys., Inc. v. Softwares, Inc., No. 02-1951, 2004 WL 742082, at *10

(D. Minn. Mar. 29, 2004) (Tunheim, J.) (emphasis added).  Yet, while AFC may be

---

[4] At one point, CHS also argues it has direct evidence of copying—namely, evidence that PetroNet's consultant, Atchley, had copies of entire sections of CHS's code in her PetroNet folder.  (See Mem. in Opp'n at 35.)  In the Court's view, however, this is not direct evidence that PetroNet actually copied the code into its own product or used it in any manner.  See, e.g., R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 274 (6th Cir. 2010) (where the factfinder is still required to infer that copying occurred, there is not direct evidence of copying).

helpful for legal analysis, the Court cannot deem the failure of CHS's expert to overtly follow it fatal to the claim.[5]

Although CHS did not conduct a detailed AFC analysis, it has identified some features of its software that are original, thus allowing the factfinder to filter out elements common in the industry that cannot be protected, just as the AFC approach directs.  See, e.g., R.C. Olmstead, Inc. v. CU Interface, LLC, 606 F.3d 262, 275 (6th Cir. 2010). Namely, it has listed at least four features of its ERP system that it claims were original and copied—the "Price Variable Table Maintenance and Variable Integrity Report," the "Time-based Contract Adjustment," the "Contract Agreement Information Extract," and the "Sales Order Processing."  (Charles Rep. ¶ 34.)  As CHS explained at oral argument, Charles essentially conducted the "filtering" required by the AFC approach prior to beginning his analysis by analyzing only the custom features that CHS claims are original and protectable.

Additionally, there is ample (albeit conflicting) evidence at the comparison step. CHS's expert opines that PetroNet's system contains virtually identical features to CHS's Solution, both on high levels of abstraction (e.g., the idea or purpose of the feature) and on a source code level (e.g., similar numbering conventions).  (See Charles Rep. ¶¶ 29, 34.)  Defendants' expert disputes these conclusions.  There are "significant differences of opinion as to whether [these elements] are protectable and, if so, whether they are substantially similar."  I-Sys., 2004 WL 742082, at *12 (denying summary judgment on

---

[5] This Court has previously excluded expert testimony that failed to apply the AFC test in a copyright-infringement case.  See Elkin II, 2010 WL 5421322, at *6.  Notably, however, neither side has raised any objection to the other's expert at this juncture.

copyright infringement claim where experts disagreed on the originality and similarity of

two software programs).  In short, "one party's expert asserts protected, unique

expression and the other, with equal force, asserts the opposite," which creates a genuine

fact dispute and renders summary judgment inappropriate on this claim.  Id.

     B.  Petroex flowcharts (Count III)

Turning next to the infringement claim involving CHS's flowcharts, the element

of copying is much clearer.  In fact, Defendants do not argue there was no copying.

PetroNet's virtually identical flowcharts, with matching typographical errors, may rise to

the level of direct evidence of copying.  (See Fletcher Decl. Ex. G.)  At the very least,

they provide ample evidence of substantial similarity.  Furthermore, Mahmood submitted

a declaration in connection with the instant Motion certifying that "Chelsea and PetroNet

will destroy all copies of the CHS PetroEx Flowcharts" (Mahmood Decl. (Doc. No. 172)

¶ 3), thereby acknowledging they in fact have copies.

While they do not dispute that copying occurred, Defendants do challenge the

timing of the copying.  In particular, they make much of the fact that CHS did not deposit

the requisite information to register the copyright in its flowcharts with the Copyright

Office until August 16, 2010 (see Am. Compl. ¶ 45), and they argue there is no evidence

that PetroNet copied the flowcharts at issue *after August 2010*.  (See Mem. in Supp. at

36.)  By fixating on the date of registration, however, Defendants apparently misconstrue

federal copyright law.

Copyright protection is not conditioned on registration.  See 17 U.S.C. § 408(a).

Rather, registration is only required before pursuing an infringement action.  See id.

§ 411(a); <u>Olan Mills, Inc. v. Linn Photo Co.</u>, 23 F.3d 1345, 1349 (8th Cir. 1994)

("Infringement itself is not conditioned upon registration of the copyright . . . . Thus, a

copyright holder can register a copyright and file suit *after* infringement occurs.")

(emphasis added); <u>Datastorm Techs., Inc. v Excalibur Commc'ns, Inc.</u>, 888 F. Supp. 112,

114 (N.D. Cal. 1995) ("Registration is not a prerequisite to a valid copyright, although it

is a prerequisite to suit.")).  Defendants make no assertion that the flowchart was not

protectable by copyright, and they do not rebut CHS's evidence that copying took place

prior to August 2010.  At this juncture, CHS's infringement claim based on the

flowcharts will therefore survive. [6]

## III.    Misuse of confidential information (Count IV)

Count IV of CHS's Amended Complaint alleges misuse of proprietary and/or

confidential information.  Defendants argue that this claim is duplicative of CHS's trade-

secret claim and must fail.  (<u>See</u> Mem. in Supp. at 37-38.)  The MUTSA "displace[s]

conflicting tort, restitutionary, and other law in this state providing civil remedies for

misappropriation of a trade secret."  Minn. Stat. § 325C.07(a).  The statute also provides,

however, that it does not affect civil remedies that are not based on misappropriation of

trade secrets.  <u>Id.</u>  Thus, only common-law claims directly based on trade secrets conflict

with the MUTSA and are displaced.  <u>See</u> <u>Micro Display Sys., Inc. v. Axtel, Inc.</u>, 699 F.

Supp. 202, 204-05 (D. Minn. 1988) (Alsop, J.).  Stated differently, "a plaintiff may only

---

[6] Defendants also argue that CHS has failed to show any damages related to infringement of the flowchart copyright.  CHS responds that Defendants have benefitted from the flowcharts in various ways, and it seeks injunctive relief, actual damages, and/or statutory damages.  In the Court's view, however, damages is not a liability issue and need not be considered here at the summary-judgment stage, but is better left to the trier of fact.

maintain separate causes of action 'to the extent that the causes of action have "more" to their factual allegations than the mere misuse or misappropriation of trade secrets.'" Mayo Clinic v. Elkin ("Elkin I"), Civ. No. 09-322, 2010 WL 760728, at *5 n.13 (D. Minn. Mar. 4, 2010) (Doty, J.) (quoting Axtel, 699 F. Supp. at 205).

In order to survive, Count IV must therefore be based on underlying factual allegations distinct from the trade-secret claim. CHS argues that Count IV "covers confidential information misappropriated by Defendants that may not fall under the umbrella of a trade secret." (Mem. in Opp'n at 41.) The Court's review of the record, however, reveals no information CHS claims as confidential that it does not also claim as trade secret. Instead, CHS repeatedly refers to confidential and trade secret information in tandem, and its arguments often conflate the two. (E.g., Mem. in Opp'n at 4 ("Defendants are liable for trade secret misappropriation if they took, disclosed, or used CHS's *confidential or trade secret* information.") (emphasis added).) Because CHS points to nothing confidential that it does not also claim is a trade secret, it has failed to allege any facts underlying Count IV that are independent from its misappropriation claim. Its common-law claim is therefore displaced by the MUTSA and cannot survive. See Elkin I, 2010 WL 760728, at *5 n.13 (granting summary-judgment where "[t]he factual allegations underlying plaintiffs' common law claim only concern [defendant]'s alleged trade secret misappropriation").

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED**:

(1)   Count I of CHS's First Amended Complaint (Doc. No. 57) is **DISMISSED**

**WITHOUT PREJUDICE**; and

(2)   Defendants' Amended Motion for Summary Judgment (Doc. No. 157) is

**GRANTED IN PART** and **DENIED IN PART** as follows:

a.   the Motion is **GRANTED** with respect to the Counts IV and V of CHS's First

Amended Complaint (Doc. No. 57) and those counts are **DISMISSED WITH**

**PREJUDICE**; and

b.   the Motion is **DENIED** with respect to Counts II and III of CHS's First

Amended Complaint (Doc. No. 57).

Dated: May 18, 2011                                    s/Richard H. Kyle
                                                       RICHARD H. KYLE
                                                       United States District Judge